UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

UNITED STATES OF AMERICA, )
 )
    Plaintiff, ) Criminal No. 12-5-ART-(4)
 )
v. )
 ) **MEMORANDUM OPINION**
TED M. SLONE, ) **AND ORDER**
 )
    Defendant. )

\*\*\* \*\*\* \*\*\* \*\*\*

Just over a year ago, defendant Ted M. Slone made certain statements to three law enforcement officers, who then searched his home and seized his property. The officers recall the encounter as pleasant and Slone as congenial and helpful. They say that Slone willingly invited them into his home, volunteered useful information, and gave them free rein to search his belongings. Slone paints a darker picture; he alleges that the officers forced their way into his home, coerced him into speaking, and searched his property without his consent, in violation of the Fourth and Fifth Amendments. Accordingly, he has moved to suppress his statements and the seized evidence. Because the officers' testimony, given on the record, is more credible than Slone's unsubstantiated allegations, his motion must be denied.

### BACKGROUND

The story begins like this. Law enforcement learned that Slone was engaged in drug trafficking. R. 187 at 2; R. 198 at 5. They decided to go talk to him because they wanted his help. *Id.* So, three officers—two DEA Agents, Greg Bunch and Brian Metzger, and one police officer, Detective Willie Skeens—drove to Slone's home. *See* R. 187 at 2. The

officers wore plain clothes, drove unmarked vehicles, and had their firearms holstered. *See id.*; R. 198 at 5–6, 42–43. The officers did not have a warrant, so they decided to conduct a "knock and talk." R. 187 at 21. They walked up to Slone's door, introduced themselves as law enforcement officers, and asked if he would invite them in and answer a few questions. *See id.* at 2–3, 21; R. 198 at 7.

Slone led Agent Bunch into his home. R. 187 at 2–3; R. 198 at 7. The other officers entered soon after. Agent Bunch told Slone right away that he was not under arrest, but no one read Slone his *Miranda* rights. R. 187 at 3, 5; R. 198 at 7, 24. Slone volunteered information about his involvement in the oxycodone ring to the officers. R. 187 at 3; R. 198 at 8–10. His wife, Sabrina, soon joined the conversation as well. R. 187 at 4; R. 198 at 9–10. Like Slone, she readily answered the officers' questions, even accessing her Facebook profile to show them pictures of other suspects. R. 187 at 4; R. 198 at 10–11.

What started as a conversation turned into a search. Noticing Slone fiddling with an object in his pocket, Agent Bunch asked him if he would be willing to empty his pockets. R. 187 at 3; R. 198 at 11. Slone complied and allowed the officers to look at the money and oxycodone pills he removed from his pocket. R. 187 at 3; R. 198 at 11–12. When Agent Bunch asked if Slone kept more pills and money in his home, Slone gave the officers permission to search his residence. R. 187 at 4; R. 198 at 12, 45–46. Agent Bunch clarified that Slone was consenting to a search, and Slone affirmed this understanding. R. 187 at 4; R. 198 at 12. Slone even agreed to help the officers with their search of his vehicles and outbuildings by restraining his dogs. R. 187 at 4; R. 198 at 12–13, 46, 60–61. Meanwhile, Mrs. Slone showed an officer where Slone kept his medication and prescriptions in their bedroom. R. 187 at 4; R. 198 at 15–16. The officers ultimately seized a variety of items

allegedly related to the oxycodone ring. R. 187 at 4–5.

On the whole, the officers' search of Slone's person and property was a pleasant affair. During the search, the Slones smoked, drank soft drinks, and moved freely about the house and curtilage. *See, e.g.*, *id.* at 5; R. 198 at 25, 44–45, 49, 65. They were courteous and helpful throughout the encounter. R. 187 at 5; R. 198 at 13, 17, 46. In total, the officers spent approximately an hour at the Slone residence. R. 198 at 39.

Slone moved to suppress his statements and the fruits of the officers' search of his property. R. 176; 186. The Court referred Slone's motion to Magistrate Judge Edward B. Atkins. Magistrate Judge Atkins held an evidentiary hearing and recommended that the Court deny Slone's motion. *See* 28 U.S.C. § 636(b)(1)(B)–(C); R. 183; R. 187. Slone objected, and the Court promised Slone a decision by Friday, July 19, 2013. R. 188; R. 197 at 1. This is that decision.

**DISCUSSION**

In his motion to suppress, Slone argued that the officers violated *Miranda v. Arizona*, 384 U.S. 436 (1966), when taking his statements and the Fourth Amendment when searching his property. *See* R. 176; R. 186. Magistrate Judge Atkins found that both arguments lacked merit and recommended that this Court deny Slone's motion to suppress. R. 187. He determined that Slone's statements were admissible under *Miranda*, because Slone was not in custody when he gave his statements. *Id.* at 8–17. He also found that the search of Slone's property did not violate the Fourth Amendment because Slone consented to the search. *Id.* at 17–23.

Slone has two overarching objections to the Magistrate Judge's report and recommendation. First, he argues that he was in custody when he made his statements to the

officers. R. 188 at 7. Next, he claims that he never validly consented to the officers' warrantless search. *Id.* at 10.

When the defendant in a criminal case objects to portions of a magistrate judge's report and recommendation, the Court reviews the proposed findings and recommendation de novo. 28 U.S.C. § 636(b)(1). Neither party requested a second evidentiary hearing, and the Court does not believe one is necessary. *See United States v. Raddatz*, 447 U.S. 667, 681 (1980). In this case, de novo review of the issues leads to the same outcome reached by the Magistrate Judge. Slone's objections will therefore be overruled.

I.    **The Magistrate Judge's Credibility Determination Was Correct.**

The Magistrate Judge essentially adopted the version of events that the officers presented. *See* R. 187 at 2–5. While he did not say so explicitly, it is obvious from his order that he found the officers more credible than Billy Slone—Slone's brother and only witness. This Court agrees with the Magistrate Judge's credibility finding. First, based on the transcript of the evidentiary hearing, the three officers' testimony was internally consistent. *See* R. 198; *see also United States v. Craft*, 150 F. App'x 413, 415 (6th Cir. 2005) (finding officers credible because they "testified consistently, one with the other"). They gave a clear and precise account of what happened, and they were forthright about the details they did not remember. *See, e.g.,* R. 198 at 39.

The evidence that Slone marshals is less impressive. Slone offered only one witness at the evidentiary hearing, his brother Billy.[1] Billy, who was present when the officers arrived at Slone's door, stated at the hearing that the officers barged into Slone's home, pulled Slone into the kitchen, and instructed Billy to leave the premises. R. 187 at 5–6; R. 198 at 72.

---

[1] The Court means no disrespect by using Mr. Billy Slone's first name. It only does so to distinguish him from his brother.

4

There is ample reason to doubt Billy's testimony. First, while a witness's familial relationship to a party is not sufficient reason to undermine his credibility, it is a factor that the Court may consider. *Cf. United States v. Abel*, 469 U.S. 45, 52 (1984) (describing how the relationship between a party and a witness may lead the witness to slant his testimony, unconsciously or otherwise). Second, the consistent testimony of three officers directly contradicts Billy's statements. *See, e.g.*, R. 198 at 58–59, 81. Third, the officers' alleged show of force does not comport with Slone's own account of the events in his motion to suppress, in which he acknowledged that he had personally "allowed" the officers "entry into the home." R. 176 at 9.

Most importantly, the content of Billy's testimony is inconsistent with other, uncontroverted evidence. As the Magistrate Judge aptly noted, only three officers were at the Slone residence that day. R. 187 at 15. They wore plain clothes, and their weapons were holstered. *Id.* Billy did not testify that the officers raised their voices or verbally threatened Slone when they sought entry into his home. *Id.* at 15–16. What is more, Billy's testimony only covers the first minutes of the officers' encounter with Slone, since he departed soon after the officers arrived. R. 198 at 72. He was not present when the officers interviewed Slone or searched his property. Because Slone and his wife did not testify at the evidentiary hearing, nearly all of the officers' testimony about their interview and search was uncontroverted. Therefore, if Billy's version of the events were adopted, the facts would be as follows: (1) The officers took pains to minimize the visible attributes of their authority and project a non-threatening appearance upon arrival; (2) they then changed tactics, strong-armed their way into Slone's home, and dragged him into his kitchen; and (3) for the remainder of their stay, they were again polite and cordial. This makes little sense. It is more reasonable to

5

assume that the officers were polite throughout their visit to the Slone residence and to discount Billy's testimony that they manhandled Slone.

Slone also relies heavily on his wife's alleged impressions of the encounter with the officers. The problem is that she did not testify and the officers did, so her allegations start with the hurdle of not being substantiated. In any event, according to Slone, Mrs. Slone was intimidated by the officers' guns and badges. *See* R. 188 at 6. An officer purportedly told her that Slone was "a mass murderer" to elicit her cooperation. *Id.* at 9. And, the officers allegedly kept Mrs. Slone and Slone separately confined. *Id.* at 6. Her tale contrasts starkly with the officers' sworn description of the events. *See* R. 187 at 4. Even if true, Mrs. Slone's story suggests at most that *her* statements to the officers might have been coerced. There is no evidence that Slone himself noticed whatever indicia of authority and coercion that Mrs. Slone allegedly observed.

In sum, the only evidence Slone has on his side is questionable testimony from Billy, unsubstantiated impressions from his wife, and the bare, unsupported allegations he made in his briefs. The credibility of this motley array of testimony and allegations pales in comparison to the officers' consistent testimony at the evidentiary hearing.

**II. No *Miranda* Warning Was Necessary Because Slone Was Not in Custody.**

Slone objects to the Magistrate Judge's finding that he was not in custody when the officers interrogated him. He believes that the officers should have given him a *Miranda* warning.

Before conducting a custodial interview, a law enforcement officer must warn the suspect of his rights under the Fifth Amendment, including his right to remain silent in response to the officer's questions. *Miranda*, 384 U.S. at 444. An interview is custodial if "there [was] a formal arrest or restraint on freedom of movement of the degree associated

with a formal arrest." *Yarborough v. Alvarado*, 541 U.S. 652, 662 (2004) (internal quotation marks omitted). The court must "examine all of the circumstances . . . that would have affected how a reasonable person in the suspect's position would perceive his or her freedom to leave." *J.D.B. v. N. Carolina*, 131 S. Ct. 2394, 2402 (2011) (internal citations and quotation marks omitted). This inquiry is objective and does not depend on the suspect's actual mindset. *Yarborough*, 541 U.S. at 667.

The Sixth Circuit has developed four factors for use when determining whether an interview was custodial: (1) the location of the interview; (2) the length and manner of questioning; (3) whether the suspect possessed unrestrained freedom of movement during the interview; and (4) whether the suspect was told that he need not answer the questions. *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009). An analysis of the *Panak* factors establishes that Slone's interview was noncustodial.

**The Location of the Interview:** The interview occurred in Slone's home, as he sat at his own kitchen table. R. 187 at 3. At home, individuals typically feel comfortable moving about, controlling the conversation, or even asking strangers to leave. *See Panak*, 552 F.3d at 465–66. This is in marked contrast to traditional custodial interrogation, in which the interrogator controls the environment. *See Beckwith v. United States*, 425 U.S. 341, 346 n.7 (1976). Of course, an interview conducted in someone's home can become custodial if law enforcement officers engage in behavior that transforms his "castle into an interrogation cell." *Panak*, 552 F.3d at 466 (citing the number of officers, the show of authority, the display of drawn weapons, and the nature of questioning as factors). Still, no credible evidence points to a transformation of this sort in Slone's home.

Slone makes many allegations of coercion in his briefs, but they are unsupported by

7

evidence in the record. His only witness at the evidentiary hearing was Billy, who testified that the officers forcibly entered Slone's home, surrounded him, and led him into his kitchen. R. 198 at 72. However, as the Court has already determined, Billy's testimony is highly inconsistent with the remainder of the evidence in the record. *See supra* Part I. And, even if the Court credited Billy's testimony, undisputed evidence shows that the remainder of the officers' visit was cordial. R. 187 at 5; R. 198 at 13, 17, 46. The officers' allegedly forcible entry would therefore be improper, but it would not change the fact that they otherwise behaved appropriately during their encounter with Slone. Slone also relies on his wife's observations to corroborate his view that the officers turned his home into an interrogation cell. *See, e.g.*, R. 188 at 6, 9. But, Mrs. Slone's second-hand tale lacks both relevance and credibility. *See supra* Part I. Since Mrs. Slone chose not to testify, her report of the events carries little weight. All that remains are Slone's bare accusations in his briefs, without testimony to support them.

**The Length and Manner of Questioning:** Undisputed evidence shows that Slone's interview lasted for no more than one hour.[2] This is consistent with the length of other noncustodial interviews. *See, e.g.*, *Panak*, 552 F.3d at 467 (forty-five minutes to an hour); *United States v. Crossley*, 224 F.3d 847, 862 (6th Cir. 2000) (less than an hour); *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999) (1.5 hours); *United States v. Jewell*, 16 F. App'x 295, 297–98 (6th Cir. 2001) (one hour). Moreover, Slone has provided no evidence that the

---

[2] It is difficult to assign a precise length to the interview based on the record. In its response to Slone's motion to suppress, the United States asserts that the interview lasted no more than an hour and that the officers remained at the Slone residence for some time beyond that. R. 178 at 7. At the hearing before the Magistrate Judge, one of the officers clarified that the interview and search together were approximately an hour. R. 198 at 39. And, the Magistrate Judge stated in his report that the interview lasted approximately twenty minutes. R. 187 at 5. In any case, the interview was shorter in length than other interviews deemed noncustodial by the Sixth Circuit. *See, e.g.*, *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999) (1.5 hours).

officers adopted a threatening or accusatory posture that might have made the minutes feel like hours. *See* R. 187 at 13.

**Slone's Freedom of Movement:** Slone's freedom of movement was largely unrestricted. Uncontested testimony from the hearing shows that the officers did not handcuff or restrain Slone and that they informed him that he was not under arrest. R. 187 at 14. The officers formally limited Slone's freedom in only two reasonable respects: they asked him to refrain from picking up weapons or from flushing his toilet. *Id.*; R. 198 at 17. During the officers' visit, Slone went into his living room at least once and stepped outside to tie up his dog. R. 198 at 25, 60–61. His wife, meanwhile, entered and exited the kitchen repeatedly, visited the bathroom, used her computer, showed an officer the way to the bedroom, and was photographed smoking a cigarette. *Id.* at 10–11, 20, 25–26, 28–29, 44–45. Thus, the actual testimony elicited at the evidentiary hearing is greatly at odds with Slone's allegations in his briefs.

**A Noncustodial Warning:** The fourth and final *Panak* factor, whether Slone was advised of his right to remain silent, cuts in the opposite direction. Even so, the Magistrate Judge rightly found, based on the totality of the circumstances, that a reasonable person would not have felt that he was under arrest or similarly restrained. R. 187 at 15. A warning is but "one factor among many," not a "necessary condition . . . before officers may question an individual in a non-custodial setting." *Panak*, 552 F.3d at 467. For this reason, the Sixth Circuit has found that many interrogations in which a warning was not given were still noncustodial. *See, e.g.*, *United States v. Robinson*, 217 F. App'x 503 (6th Cir. 2007), *cert. denied*, 552 U.S. 846 (2007); *Jewell*, 16 F. App'x at 297–98.

For example, in *United States v. Flores*, 193 F. App'x 597, 605–06 (6th Cir. 2006), the

Sixth Circuit held that a defendant's interview was noncustodial even though six officers carrying firearms and wearing body armor were present and a phalanx of armed officers formed a perimeter around his home. There can be no doubt that this heavy officer presence created a more coercive atmosphere than existed in this case. Despite this evidence, the Sixth Circuit found in *Flores* that the defendant was not in custody, since he was not handcuffed or restrained; he freely escorted one officer to a different location; and the interview took place in his home. *Id.* at 606. All of these factors, and more, exist in Slone's case. There is no reason to believe that Slone, who had the same level of freedom as the defendant in *Flores* and fewer officers to contend with, was in custody during his interrogation.

**Other Objections:** Slone's remaining objections are easily disposed of. He makes much of the fact that the officers did not have him sign a waiver of his *Miranda* rights. R. 176 at 6; R. 188 at 2. But, a noncustodial interview need not be accompanied by a signed waiver to be constitutional. *See, e.g.*, *Oregon v. Mathiason*, 429 U.S 492, 494–95 (1977) (holding that *Miranda* does not apply to noncustodial questioning). Additionally, Slone emphasizes his subjective view that his liberty was constrained during the interview. *See, e.g.*, R. 188 at 3. Since the relevant standard is objective, Slone's subjective perception of his encounter with the officers has no bearing on the Court's analysis. *See J.D.B.*, 131 S. Ct. at 2402.

Undisputed testimony from the evidentiary hearing shows that Slone was not in custody during his interview. Therefore, the Court does not need to suppress his statements for lack of a *Miranda* warning.

### III. The Officers Did Not Need a Search Warrant To Search Slone's Home Because Slone Consented to the Search.

The Magistrate Judge correctly found that Slone voluntarily consented to the officers'

search of his property, thereby rendering the search constitutional under the Fourth Amendment. R. 187 at 17–23. Voluntary consent is a well-established exception to the Fourth Amendment's mandate that the government obtain a warrant before searching an individual's person or property. *United States v. Cochrane*, 702 F.3d 334, 342 (6th Cir. 2012). Evidence discovered during a search based on voluntary consent may be seized and admitted at trial. *United States v. Richardson*, 949 F.2d 851, 858 (6th Cir. 1991). In contrast, where evidence was obtained in violation of the Fourth Amendment, suppression may be warranted. *See Mapp v. Ohio*, 367 U.S. 643, 655 (1961). This depends on the culpability of the police during their search and the potential that exclusion will deter wrongful police conduct. *See Herring v. United States*, 555 U.S. 135, 137, 144 (2009). If a defendant moves to suppress seized evidence, the United States has the burden of proving by a preponderance of the evidence that he voluntarily consented to the search. *See United States v. Matlock*, 415 U.S. 164, 177 (1974).

To be voluntary, consent must be "unequivocal, specific, and intelligently given, uncontaminated by any duress or coercion." *United States v. Scott*, 578 F.2d 1186, 1188–89 (6th Cir. 1978). Voluntariness is determined "from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). Relevant factors include the suspect's age, intelligence, and education; whether he understands his right to refuse consent; the length and nature of his detention; the use of coercive or punishing conduct by the police; and other indications of coercion. *Cochrane*, 702 F.3d at 342.

Considering the totality of the circumstances, a preponderance of the evidence supports the conclusion that Slone voluntarily consented.[3] As the Magistrate Judge found,

---

[3] Slone also alleges at various points that the officers did not obtain consent from his wife. *E.g.*, R. 188 at 6. Mrs. Slone's consent was, however, unnecessary at the start of the search, since Slone apparently

11

nothing in the record suggests that Slone, despite his limited education, did not understand what he was authorizing the officers to do when he told them they could search his home, vehicles, and outbuildings. R. 187 at 20. No witnesses at the evidentiary hearing disputed the officers' testimony that Slone consented clearly and repeatedly to their search. *See* R. 198 at 12. His detention was brief, informal, and noncustodial in nature. *See supra* Part II. No evidence of coercive or punitive conduct by the officers exists; the officers did not brandish their weapons or threaten Slone in any way that would render his consent involuntary. *See* R. 198 at 46. On the contrary, uncontroverted testimony from the officers suggests that relations between Slone and the officers were cordial. R. 187 at 5; R. 198 at 13, 17, 46. Even the officers' use of the "knock-and-talk" tactic did not affect the voluntariness of Slone's consent. *See Kentucky v. King*, 131 S. Ct. 1849, 1858 (2011) ("If consent is freely given, it makes no difference that an officer may have approached the person with the hope or expectation of obtaining consent.").

There is, of course, one black mark against the United States: The officers did not tell Slone he could refuse consent. R. 187 at 21. Slone attempts to push this argument to its limit. Citing *United States v. Ivy*, 165 F.3d 397 (6th Cir. 1998), he contends that the Magistrate Judge's failure to state on the record that Slone understood his right to refuse consent constitutes reversible error. R. 188 at 7. This is wrong. Slone misinterprets *Ivy*, which merely requires that a court examine, among other factors, whether the individual understood that right. *Ivy*, 165 F.3d at 402. Consent can still be voluntary without knowledge of one's

---

authorized the search in her absence. *See Georgia v. Randolph*, 547 U.S. 103, 108 (2006) (finding that consent from a fellow occupant who shares common authority over property is a valid basis for a search when the suspect is absent); *Matlock*, 415 U.S. at 170 ("[T]he consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared."). There is also no testimony from the hearing showing that Mrs. Slone objected to the

12

right to refuse. *Schneckloth*, 412 U.S. at 227. In his report, the Magistrate Judge recognized his obligation to consider this factor. R. 187 at 18–19 (citing *Cochrane*, 702 F.3d at 342, which sets forth a more comprehensive version of the test in *Ivy*). While he made no explicit finding concerning Slone's subjective knowledge of his right to refuse consent, the Magistrate Judge adequately conducted the careful examination that *Ivy* demands. *Id.* at 18–22. He weighed Slone's age, intelligence, education level, and ability to understand the consequences of his consent; the length and character of the interview; the lack of coercive or punishing conduct; and the implications of the officers' failure to inform Slone of his right to refuse consent. *Id.* Because the Court agrees with the Magistrate Judge's analysis, the Court will not rehash these factors further in this opinion.

Based on a totality of the circumstances, the officers' failure to point out Slone's rights did not destroy the constitutionality of their search. Because their search was valid under the Fourth Amendment, the Court need not suppress evidence seized by the officers.

## CONCLUSION

Accordingly, it is **ORDERED** that the Court **OVERRULES** the defendant's objections, R. 188. The Court **ADOPTS** Magistrate Judge Edward B. Atkins's Report and Recommendation, R. 187, denying the defendant's motion to suppress, R. 176.

This the 19th day of July, 2013.



Signed By:
*Amul R. Thapar*
United States District Judge

---

search. Additionally, any failure to obtain proper consent from Mrs. Slone would violate her Fourth Amendment rights, not Slone's.